## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| **v.** | **:** | **CRIMINAL NO. 25-440-1** |
| **JOSEPH M. MOORE** | **:** | |

### GOVERNMENT'S SENTENCING MEMORANDUM

For many years, defendant Joseph M. Moore, a Philadelphia Probation Officer operated an illegal sports gambling business, working with his codefendant, James DeAngleo, a Philadelphia Police Officer. Both defendants held positions of trust within law enforcement and knew better than to operate an illegal business that they used to generate hundreds of thousands of dollars in revenue and substantial profits for themselves at the expense of losing gamblers. On the positive side for the defendant, he admitted to his misconduct when confronted by law enforcement authorities expressed remorse, and shortly thereafter, agreed to plead guilty to an information. The government recommends a sentence within the advisory guideline range of 12 to 18 months, absent any basis for a below-guideline sentence addressed in the supplemental sealed attachment to this sentencing memorandum.[1] The government also requests that the Court impose a forfeiture money judgment of $200,000.

---

[1] As this Court knows, the supplemental sealed attachment is filed in *every* case and addresses additional issues, if any, for the Court's consideration at sentencing.

A sentencing court follows a two-step process, first calculating the range under the Sentencing Guidelines, and then considering that range along with all pertinent 18 U.S.C. § 3553(a) factors in determining the appropriate sentence. *See* USSG § 1B1.1 (Nov. 1, 2025).[2]

At the second step of the sentencing process, "[t]he record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted). *See also Rita v. United States*, 551 U.S. 338, 356 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority."); *United States v. Flores-Mejia*, 759 F.3d 253, 256 (3d Cir. 2014) (en banc) ("Failure to give 'meaningful consideration' to any such argument renders a sentence procedurally unreasonable which, when appealed, generally requires a remand for resentencing.").

The government explains below its consideration of the Section 3553(a) factors and its basis for recommending a sentence within the applicable guideline range.

---

[2] Courts previously followed a three-step process, in which the court first calculated the guideline range, then next ruled on motions for departure, before considering the 3553(a) factors. *See United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006). In an extensive amendment to the Guidelines effective November 1, 2025, the Sentencing Commission eliminated the departure provisions in the manual and dictated the two-step process described above.

I.       **BACKGROUND**

On October 27, 2025, the defendant pled guilty to conducting an illegal gambling business, in violation of 18 U.S.C. § 1955. During his plea colloquy, the defendant admitted to the following, among other facts:

**Background of Participants in Moore Gambling Business**

Defendant Joseph M. Moore was a Philadelphia Probation Officer, who owned and operated a sports wagering business (the "Moore Gambling Business"). Moore's partner in the business was co-defendant James P. Deangelo, Jr., a Philadelphia Police Officer. Moore ran his gambling business, in part, from his Philadelphia Probation Department office and maintained records of his operation on his work computer. DeAngelo, among other things, worked with Moore to provide bettors with access to an overseas website that allowed bettors to place wagers online with the Moore Gambling Business.

Person #1 and Person #2,[3] participated in conducting the Moore Gambling Business by collecting wagered funds from sports bettors and by paying successful bettors their winnings, all at the direction of Moore. Moore paid Person #1 and Person #2 between $200 and $250 per week for their services.

Person #3 participated in conducting the Moore Gambling Business by working with DeAngelo to provide access to an overseas gambling website that allowed bettors to place wagers online with the Moore Gambling Business. Person #4 and Person #5 worked with Person

---

[3] Individuals identified but not charged in the information have been anonymized in the information and in this memorandum in this fashion. They are all known to the government and the defendant.

#3 and at times collected payments for the gambling website from DeAngelo. Person #6 ran his own sports gambling business but also participated in conducting the Moore Gambling Business by occasionally, at the request of Moore, funding losses incurred by the Moore Gambling Business or otherwise assuming financial responsibility for certain wagers.

**Gambling Operation Activity**

From at least January 2017 through at least February 2025, Moore ran a sports gambling business in which numerous bettors regularly placed bets on sporting events and participated in gambling pools related to sporting events. Moore's partner in the business was James DeAngelo. DeAngelo's primary role in the operation was arranging for bettors to gain access to a website run overseas that the Moore Gambling Business used for bettors to obtain betting odds and record their bets. The website was critical to the Moore Gambling Business because the website provided information for bettors to make wagers on games, including identifying "spreads" on sporting events, the website registered their bets, and the website helped Moore maintain records of the betting activity of his customers. DeAngelo worked closely with Person #3, who was his main contact with operations of the overseas website.[4] As Moore's partner, DeAngelo also occasionally helped obtain bettors for the Moore Gambling Business. DeAngelo's compensation for his role in the Moore Gambling Business was approximately 20% of the profits generated by Moore.

The Moore Gambling Business involved several other individuals who helped conduct the operation. Person #1 and Person #2 collected wagers from bettors and paid winners,

---

[4] At times, Person #3 directed DeAngelo to make payments for the overseas website to Person #4, who on multiple occasions had Person #5 handle the collection. Whenever there were problems with the website or adjustments needed to be made to the betting lines for the Moore Gambling Business, DeAngelo handled those issues with Person #3.

generally through peer-to-peer financial accounts such as Venmo, PayPal, Cash App, and Apple Pay. Moore obtained the assistance of Person #1 and Person #2 to handle these transactions when he had difficulty using his own peer to peer accounts at times because the accounts were suspended or closed due to the suspicious activity relating to the gambling transactions. Financial and other records reflect hundreds of thousands of dollars involved in this operation that served hundreds of bettors in the Philadelphia area.5

The Moore Gambling Business allowed individuals to place various types of bets on sporting events. The betting included wagers on the outcome of individual games as well as wagers involving "block pools" and other sports gambling pools. The block pools that Moore operated were gambling contests in which bettors were assigned random numbers corresponding to the points scored by teams in a particular game. Those games included NFL football games, NCAA basketball games, and other sporting events. The entry fee for these pools was as much as $500, which would generate thousands of dollars for the winners. Winners paid Moore approximately 10% of their winnings as a "tip" or fee for participating in the pool. For ordinary bets on sporting events, bettors paid a fee to Moore that was included in the cost of the bet.

Moore also allowed bettors to participate in annual NFL football pools, called the "Gentlemen's Football Pool," in which the bettors each week would select games and pick the winners of those games, with a substantial payment to the top performers in the pool at the end of the NFL season. Similar to the block pools, winners paid Moore approximately 10% of their winnings as a "tip" or fee for participating in the pool. With over 500 participants who paid an annual $100 entry fee, thousands of dollars were generated for winners and for Moore in the

---

5 Moore has agreed for sentencing purposes that his personal profits on this scheme were at least $200,000.

"tips" or fees he collected. Moore ran other similar pools on other sporting events and collected fees in a similar way.

Moore allowed bettors to make bets on credit, without having to pay until they lost their wagers, and at times, allowed losing bettors to lose multiple bets and incur debt before they paid Moore. Individuals who placed wagers with the Moore Gambling Business also could avoid paying taxes on their winnings because, as an illegal business, the Moore Gambling Business did not report its business activities to the IRS.

### Financial Account Activity

There was substantial financial activity involved in the operation of the Moore Gambling Business and other gambling by DeAngelo. For example:

Records from Moore's PayPal account ending in #1544 show that from January 2018 through July 2023, in numerous transactions in this account with other PayPal users, Moore received a total of $903,799 and transferred out a total of $630,635. A significant number of the transactions in these PayPal records were from individuals making payments to Moore and they included notations that referenced sporting events and gambling activity, *e.g.,* "March Madness," "NBA," and "Thanksgiving Football."

Of the $903,799 Moore received in his PayPal account, PayPal records reflect that from January 2018 through July 2023, Moore transferred $448,795 to personal accounts he held at Police and Fire Federal Credit Union ("PFFCU"), Philadelphia Federal Credit Union ("PFCU"), Citizens Bank, and JP Morgan Chase Bank ("Chase Bank"). This activity reflects that he was using PayPal to receive payments in his gambling business, and he was transferring funds to his personal account, that at least in part, represent revenue from his illegal gambling operations. The PayPal records also show that from January 2018 through July 2023, Moore transferred

$47,835 to DeAngelo, and DeAngelo transferred $9,070 to Moore.

Records from Moore's Venmo account ending in #2976 show that from January 2018 through July 2023, in numerous transactions with other Venmo users, Moore received a total of $183,421 and paid a total of $82,225. Like the PayPal transactions discussed above, most of these Venmo transactions included notations referring to sporting events and sports betting. Of the $183,421 received, Moore transferred $17,412 to accounts he held at Citizens Bank and TD Bank.

Records from Moore's Cash App account showed that from August 2018 through December 2024, in numerous transactions with other Cash App users, Moore received a total of $919,898 and transferred out a total of $383,060. Many of the notations associated with the transactions referred to sporting events and sports gambling relating to sports gambling, such as "super bowl," "football pool," "1st game," and emojis of sports symbols. Of the $919,898 that Moore received, he transferred $631,077.81 to personal accounts he held at PFFCU, PFCU, Chase Bank, and WSFS Bank.

Records from the Apple Pay "Joseph Moore" account from May 2019 through May 2023, show that in numerous transactions with other users, Moore received a total of $578,558 and transferred $394,471. Many of the usernames and dollar amounts in these transactions were the same or similar to those in other transactions in accounts discussed here, making clear that these were sports gambling transactions. Of the $578,558 received, Moore transferred $338,496.43 to accounts he held with PFCU, Chase Banks, PFFCU, and WSFS. From this Apple Pay account, Moore directly exchanged funds with DeAngelo and others involved in the operation, such as Person #1 and Person #2 who were collecting and transferring funds for Moore.

### Email and Electronic Communications Activity

Moore, DeAngelo, and other participants in the Moore Gambling Operation engaged in

substantial email and electronic communication activity, including iMessages and texting. Bettors communicated with Moore, DeAngelo, and other individuals conducting this business, such as Person #1 and Person #2, about making bets and the transfer of funds relating to the betting activity. For example:

During the operation of the Moore Gambling Activity, from several different accounts, Moore sent emails to hundreds of bettors that discussed betting parameters for sporting events, including descriptions of the betting rules and payment details. DeAngelo was included on the blind copy line ("BCC") for a substantial number of the gambling emails that were sent to numerous bettors, reflecting his conspiratorial activity with Moore. Moore's email accounts contained numerous emails between Moore and DeAngelo in which they discussed the gambling operation.

Numerous emails and texts also reflected that Moore was conducting this gambling operation from his Probation Department office. For example, on January 29, 2024, Moore directed Person #2 in an electronic communication to withdraw $2,000 from his account for a winning better. Person #2 responded to Moore: "Sounds good. I'll do it before I leave for field. Should I put it in your desk?" Moore replied, "Yeah top drawer please." Google records reflected that Moore regularly used one of the Gmail accounts for his gambling business activity from his Probation Department office.

II.    **SENTENCING CALCULATION**

A.    **Statutory Maximum Sentence.**

The maximum sentence that may be imposed on the defendant is a term of imprisonment of five years, a term of supervised release of three years, a fine of $250,000, and a special assessment of $100.

B.    **Sentencing Guidelines Calculation.**

The Probation Office correctly calculated the defendant's advisory guideline range as follows:

| | |
|---|---:|
| Base offense level – USSG § 2E3.1(a)(2) | 12 |
| Organizer or leader -- USSG § 3B1.1(a) | +4 |
| Timely Acceptance of responsibility -- USSG § 3E1.1(a) and (b) | -3 |
| Total Offense Level | 13 |

Based on a Criminal History Category of I and a Total Offense Level of 13, the applicable guideline range for Moore is 12-18 months, which is in Zone C of the Sentencing Table. Thus, under USSG § §5C1.1(d), the minimum term may be satisfied by (1) a sentence of imprisonment; or (2) a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention according to the schedule in subsection (e), provided that at least one-half of the minimum term is satisfied by imprisonment.

III.    **ANALYSIS**

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range." *Peugh v. United States*, 569 U.S. 530, 542 (2013) (quoting

*Freeman v. United States*, 564 U.S. 522, 529 (2011) (plurality opinion); ellipsis in original). "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences." *Peugh*, 569 U.S. at 543. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id.* at 544.

In addition, this Court must also consider all the sentencing factors set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

### A.     Consideration of the 3553(a) Factors.

#### (1)     The nature and circumstances of the offense.

The nature and circumstances of Moore's criminal conduct are serious. Moore was a county probation officer who was responsible for supervising offenders in the criminal justice system. He knew better than anyone the importance of following the law and setting an example for those he supervised. While there are obviously far more serious crimes in the federal system, Moore should not have joined with another public servant, a Philadelphia Police Officer, to run an illegal gambling operation for profit – and to do so in part from his government office. The defendant also involved other individuals in his scheme whom he exposed to serious

consequences. Moore and DeAngelo held positions of responsibility with two different law enforcement organizations that serve the public, and they engaged in behavior that was entirely contrary to their public missions. The nature and circumstances of the offense warrant a within-guidelines sentence.

**(2)      The history and characteristics of the defendant.**

Joseph Moore is a 43-year-old man with a supportive family, a good upbringing, and no history of drug or mental health problems. He has done well in his career as a probation officer. He has no criminal history. Unlike so many cases that come before this Court, the defendant's personal history does not offer any explanation for his decision to engage in this criminal conduct. Clearly, the defendant should have known better.

As reflected in the defendant's sentencing memorandum, the defendant has engaged in many positive acts in his life and has many friends and family who support him. He also took the appropriate steps in this case when he was confronted by law enforcement in this matter. He has obtained new employment and, as far as the government knows, is leading a law-abiding life. This Court should consider these facts as well in fashioning an appropriate sentence.

**(3)      Promoting respect for the law, imposing just punishment based on the seriousness of the offense; and**

**(4)      The need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.**

A sentence within the applicable guidelines range would appropriately punish the defendant for his criminal activity. A guidelines sentence would promote respect for the law and deter individuals in public law enforcement positions from engaging in this type of criminal activity. Moore engaged in this conduct as a probation officer, he did so with a Philadelphia Police Office as his partner, and at times he conducted his illegal business from his government office. Such behavior is entirely inconsistent with the duties and responsibilities of an individual

in public service and calls for appropriate punishment.

As numerous courts have recognized, fidelity to the guidelines and imposing serious prison sentences serve a particularly important purpose in prosecuting white-collar crime.  For instance, the Supreme Court in *Mistretta v. United States*, 488 U.S. 361, 375 n.9 (1989), noted that the Senate Report on the Sentencing Reform Act "gave specific examples of areas in which prevailing sentences might be too lenient, including the treatment of major white-collar criminals."  *Accord United States v. Ebbers*, 458 F.3d 110, 129 (2d Cir. 2006) ("[T]he Guidelines reflect Congress' judgment as to the appropriate national policy for [white-collar] crimes...."); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (noting the importance of "the minimization of discrepancies between white- and blue-collar offenses").

The government appreciates that the defendant's conduct did not involve violence or the threat of violence as is prevalent in many illegal gambling operations. The government also recognizes that the defendant is not a likely recidivist. The point remains that the Court's sentence should account for the need to deter others in public positions from engaging in criminal conduct and communicate to the public that an individual in the defendant's circumstances will face consequences for his actions. A guideline sentence would properly account for those considerations.

> **(5)** **The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

There is no need in this case to provide the defendant with educational or vocational training. Thus, this statutory factor should not affect the Court's sentencing determination.

> **(6)** **The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.**

Considering all the facts and circumstances discussed in this memorandum, the recommended sentence would not result in any unwarranted disparities among similarly situated defendants. Courts regularly sentence defendants to sentences within the guidelines range. The recommended sentence fairly considers this defendant's conduct and the circumstances of his case, and there is no basis to conclude that a sentence within the guidelines range would result in any disparities.

**(7)     The need to provide restitution to any victims of the offense.**

This Court need not otherwise fashion a sentence that considers the need for the defendant to pay restitution. Restitution is not an issue in this case.

**B.     Supervised Release.**

Pursuant to Sections 5D1.1 and 5D1.2 of the Sentencing Guidelines, as amended effective November 1, 2025, the Court is directed to conduct an "individualized assessment" when deciding whether to impose a term of supervised release, and if supervised release is imposed, how long the term should be. The Court is further directed to state in open court its reasons for imposing or not imposing a term of supervised release, and its reasons for the length of a term imposed. Further, Section 5D1.3 sets forth mandatory conditions of a term of supervised release, and "discretionary conditions" that the Court may impose, following the same individualized assessment.

The guideline commentary, consistent with 18 U.S.C. § 3583(c), provides that the "individualized assessment" should rest on consideration of the same sentencing factors under 18 U.S.C. § 3553(a) that are considered with respect to a term of imprisonment, with the exception of Sections 3553(a)(2)(A) (the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense") and 3553(a)(3)

("the kinds of sentences available"), which do not apply with regard to supervised release decisions.

In this case, based on the arguments set forth above, the government defers to the Court in fashioning a term of supervised release of no more than the maximum of three years. A term of supervised release in this case advances the goals of sentencing, including promoting respect for the law and deterring others from engaging in criminal conduct.

This assessment also supports imposition of all the mandatory and standard conditions of supervised release listed in Section 5D1.3.

## IV.  CONCLUSION

The government's final recommendation regarding sentencing appears in the sealed attachment.

Respectfully submitted,

DAVID METCALF
United States Attorney


*/s Louis D. Lappen*
LOUIS D. LAPPEN
Assistant United States Attorney

## **CERTIFICATE OF SERVICE**

I hereby certify that this Sentencing Memorandum has been served through the Electronic

Case Filing (ECF) system and via email, on counsel for the defendant, James A. Funt, at

**jfunt@weirlawllp.com**.


/s Louis D. Lappen
LOUIS D. LAPPEN
Assistant United States Attorney


DATED:  April 2, 2026.